Derek A. Newman, State Bar No. 190467
*derek@newmanlaw.com*
NEWMAN DU WORS LLP
100 Wilshire Boulevard, Suite 950
Santa Monica, CA 90401
Telephone: (310) 359-8200
Facsimile: (310) 359-8190

John Du Wors, State Bar No. 233913
*duwors@newmanlaw.com*
Derek Linke, *pro hac vice*
*linke@newmanlaw.com*
NEWMAN DU WORS LLP
1201 Third Avenue, Suite 1600
Seattle, WA 98101
Telephone: (206) 274-2800
Facsimile: (206) 274-2801

Attorneys for Plaintiff
FUTURE ADS LLC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| FUTURE ADS LLC,<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN L. GILLMAN, et al.,<br><br>Defendants. | No.: SACV 13-00905 DOC (JPRx)<br><br>**DECLARATION OF WILLIAM C. EASTTOM II IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION TO STRIKE COMPLAINT, OR IN THE ALTERNATIVE, TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Date:  September 9, 2013<br>Time:  8:30 a.m.<br>Dept.:  Courtroom 9D<br>Judge:  Honorable David O. Carter<br><br>Action Filed: June 14, 2013 |

I, William C. (Chuck) Easttom II, hereby testify and declare as follows:

    1. I am over the age of 18 years and competent to testify in this action.

    2. I am a computer scientist and computer consultant. For approximately 20 years, I have worked in the computer science industry, including extensive experience in computer and network security. I have authored fifteen computer

science books, eight of which are on the topic of computer programming. I hold twenty eight different computer industry certifications, and helped create four computer industry certifications (CompTIA Security+, CompTIA Server+, and CompTIA Linux+ as well as the EC Council Certified Encryption Specialist). Two of my books are computer security text books used at universities around the world. I have been a guest speaker on computer security-related topics at numerous locations including Southern Methodist University, Harvard University, and Columbia University. I have also conducted computer security teaching and training both for colleges and private corporate clients for over ten years, most notably teaching computer security courses to the United States Secret Service.

3. Attachment A to this Declaration is a true and correct copy of my CV.

4. The issue examined in this Declaration is the use of the term *adware* and its meaning. To determine how the term adware is viewed in both the computer security industry and by the general public, I relied on a survey of textbooks and other literature related to computer security and on my own extensive experience training and consulting on computer security matters. I am familiar with the major sources for information for computer security and other IT professionals, as well as commonly-accessed sources of information for general computer users. My literature survey reflects texts that are major sources of information for one or all of these groups.

5. My survey of computer-security literature reveals that major books, articles, and websites group the term 'adware' in the same category as they group spyware, viruses, and other malware. Even though some of these sources explain that the purpose of adware is to generate advertisements, the overall impression is that adware is malware that will harm users' systems. Several of the sources expound upon methodologies for removing adware along with 'other' malware.

6. One example comes from the CompTIA Advanced Security Practitioner Certification Study Guide, which directly groups adware with

malware. According to CompTIA, the organization is "a non-profit trade association advancing the global interests of IT professionals and companies." CompTIA's Board of Directors includes executives from Dell, Verizon, Xerox, and other major information technology firms, as well as experts in computer security. CompTIA advertises that it is the leading provider of technology-neutral and vendor-neutral IT certifications. The Guide states: "As technology has advanced, the need to detect other common threats, including worms, Trojan horses, spyware, adware, and rootkits, has led to newer technologies including anti-spyware and anti-malware."[1] In this example, adware is put in the same category as significant threats such as computer worms. This indicates that adware is a danger to users' systems.

7. Another example comes from the Certified Information Systems Security Professional (CISSP) All-in-One Exam Guide.[2] The Guide is published by the International Information Systems Security Certification Consortium, Inc. (ISC)². (ISC)² is a not-for-profit organization that educates and certifies information security professionals. (ISC)²'s Board of Directors includes executives from Microsoft, Global 100 healthcare organizations, Fortune 500 companies, and senior managers with the United States government. (ISC)² has over 75,000 members. According to (ISC)², "CISSP certification is a globally recognized standard of achievement that confirms an individual's knowledge in the field of information security. CISSPs are information assurance professionals who define the architecture, design, management and/or controls that assure the security of business environments." In the chapter entitled "Malicious Software (Malware)", author Shon Harris addresses adware in a section entitled 'spyware and adware'.

---

[1] CASP CompTIA Advanced Security Practitioner Certification Study Guide by Conklin, White, and Williams from McGraw-Hill Osborne Media.

[2] CISSP All-in-One Exam Guide, 6th Edition, by Shon Harris, from McGraw-Hill Osborne Media at p. 1204.

3
**DECLARATION OF WILLIAM C. EASTTOM II**

Placing adware with spyware—in a chapter entitled "Malicious Software—indicates that it is considered on par with spyware and likely to harm users' system.

8. Purdue University's "Secure Purdue" website, aimed at educating Purdue's faculty and staff about computer security issues and available to the general public,[3] groups Adware, Spyware, and malware together. Purdue defines adware as advertisement software and groups it with malware, giving the impression that adware is malware.

9. Krutz & Cole's Network Security Bible, a reference text for computer security and other IT professionals, directly conflates adware with spyware:

> Anti-spyware and adware tools do exactly what their name implies. They are designed to remove or block spyware. Spyware is computer software installed without the user's knowledge. Usually its goal is to find out more information about the users' behavior and to collect personal information.[4]

10. These sources correlate with my professional experience teaching and speaking on computer security. I have given talks on computer security to various audiences ranging from the Harvard Computer Society, to local PC users groups. I have also been conducting computer security training for the past 10 years. The general attitude that I encounter is that adware is a form of malware (malicious software) and is harmful to one's computer system.

11. It is clear from both documentary evidence and from my professional experience that both the general public and computer professionals view adware as a form of malware that is potentially harmful to their system. The reality is that

---

[3] Purdue http://www.purdue.edu/securePurdue/bestPractices/spyware.cfm

[4] Network Security Bible Network Security Bible by Ronald Krutz and Eric Cole from Wiley Press

4
**DECLARATION OF WILLIAM C. EASTTOM II**

advertising software serves the same function that commercials serve in broadcast television. That function is to provide advertising for products and services, and to use that advertising to enable the broadcaster to provide users with content at no charge. The advertising revenue subsidizes the content, thus allowing the user to access that content for free. This means that the reality of advertising software is that it can be a great benefit to end users. But categorizing a given software as 'adware' gives users the impression that it is harmful and thus deters them from availing themselves of the benefits of the software.

12. Classifying a given software product as 'adware' is a derogatory term that leaves users and potential users with the impression that the software is harmful to their system. This leads users to avoid the software and in fact remove it from their systems, when in fact it can benefit the end user by providing them with free content.

13. I downloaded Future Ads' App from a publicly-accessible website on 8/14/2013 to a laptop running Windows 8 and ran several tests on it. The laptop I used does not have any special features that would interfere with spyware or malware's operation; it is similar in operation to laptops operated by ordinary computer users. Based on my experience of over 18 years in the computer science industry with the last 12 directly related to computer security and malware and my training, I am familiar with industry standards for testing software applications like the Future Ads App for behavior and effects on a computer system. I am also familiar with industry standards for identifying and removing malware and spyware.

14. In my testing I used standard tools, beginning with Norton and MacAfee anti-virus products. These are two of the most widely-used anti-virus software solutions. I also used WireShark, one of the most widely-used network packet sniffers, to determine if the software in question was sending data. I have been working with WireShark for over a decade. WireShark is a very popular tool

5
**DECLARATION OF WILLIAM C. EASTTOM II**

with computer network professionals, and is commonly used to detect what data is being transmitted to and from a given computer. One of the key functions of spyware is to send data from the computer on which it was installed out to other locations; the purpose of spyware is to collect and transmit information. WireShark detects spyware by determining if an application is sending data from the computer on which it is installed to some other location.

15. I also used process viewers, including the one built into Windows, to determine what processes were running on my system after I downloaded Future Ads' App. Process viewers are standard tools widely used to determine exactly what is running on a given system.

16. The tests that I used are all standard for network security professionals.

17. The App's installation was simple and easy to follow. It would be an easy task for a low-skilled computer user to install. While it was installed, I ran Norton Anti-Virus and MacAfee Anti-virus. Neither of which detected this software as a virus. I also ran process viewers to determine exactly what was running on the PC. I could not detect any monitoring of user activity. Specifically, I detected no recording of web site activity, key strokes, emails, or other activity. Also, running the WireShark network packet sniffer, I could not detect any signs that the App was sending information to anywhere. In essence, no test I conducted detected any behavior that would be consistent with a virus or spyware.

18. I also could not detect any noticeable change in computer performance. CPU and memory utilization was essentially the same before and after I installed the App. This is an important test since malware, of any type, generally consumes excessive system resources.

19. The uninstallation procedure was the same as for any standard software. I utilized the Windows Control Panel and the Programs and Features to uninstall the App. This equipment is standard on Windows 8, and requires no

special training or expertise to utilize. I was able to easily locate the App and it uninstalled with no problems. This is also not consistent with malware. Normally spyware, viruses, worms, etc. are all difficult to uninstall.

20. Nothing in my testing indicated that the App behaved in any manner like spyware or malware. It caused absolutely no harm or disruption to the system and was easy to remove.

21. Based on my training, experience, knowledge of the computer security industry, and the information and tests described in this declaration, it is my opinion that Future Ads' App is not adware as the term is commonly used or understood. I reach this conclusion because the App does not have any of adware's characteristics. I also conclude that the App is not either spyware or malware, because it has none of the characteristics of spyware or malware.

22. I have testified as an expert in 3 other cases within the previous four years, either at trial or by deposition. I have been designated as testifying expert in other cases which have settled before deposition or trial. Attachment A contains a true and correct list of those cases.

23. Attachment A to this Declaration contains a true and correct list of all publications I authored within the previous ten years.

24. I am being compensated at my usual rate of $250 per hour for work on this case. My opinions are in no way related to compensation.

I certify and declare under the penalty of perjury of the laws of the United States that the foregoing is true and correct.

Signed this 19th day of August, 2013, at Plano, Texas.

7
**DECLARATION OF WILLIAM C. EASTTOM II**

1
2   _____
    William C. Easttom II
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DECLARATION OF WILLIAM C. EASTTOM II**